UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHARLES S. HOTTENSTEIN,                  :
Administrator for the Estate             :      HONORABLE JOSEPH E. IRENAS
of Tracy Hottenstein;                    :      CIVIL ACTION NO. 11-740
CHARLES S. HOTTENSTEIN; and              :              (JEI/JS)
ELIZABETH K. HOTTENSTEIN,                :
                                         :
          Plaintiffs,                    :              **OPINION**
                                         :
     v.                                  :
                                         :
CITY OF SEA ISLE CITY;                   :
et al.,                                  :
                                         :
          Defendants.                    :

**APPEARANCES:**

THE WESTCOTT LAW FIRM, P.C.
By:  Lynanne B. Wescott, Esq.
239 South Camac Street
Philadelphia, Pennsylvania 19107
          Counsel for Plaintiffs

POWELL, BIRCHMEIER & POWELL, P.C.
By:  James R. Birchmeier, Esq.
1891 State Highway 50
P.O. Box 582
Tuckahoe, New Jersey 08250
          Counsel for Defendants City of Sea Isle City, Harold
          Boyer, Thomas McQuillen, and Vincent Haugh

LAW OFFICES OF JAY J. BLUMBERG, ESQ.
By:  Christopher M. Wolk, Esq.
158 Delaware Street
P.O. Box 68
Woodbury, New Jersey 08096
          Counsel for Defendants Zaki Khebzou and Atlantic
          Emergency Associates

MAYFIELD TURNER O'MARA & DONNELLY, P.C.
By:  Michael J. O'Mara, Esq.
     Robert J. Gillespie, Jr., Esq.
2201 Route 38, Suite 300
Cherry Hill, New Jersey 08002
          Counsel for Defendants Sea Isle Ambulance Corps and
          Phyllis Linn

FOX ROTHSCHILD, L.L.P.
By:  Peter Sarkos, Esq.
     Epiphany McGuigan, Esq.
1301 Atlantic Avenue, Suite 400
Atlantic City, New Jersey 08401
          Counsel for Defendants Atlanticare Regional Medical
          Center, Atlantic City Medical Center, Atlanticare MICU
          Medics at Base 3


**IRENAS,** Senior United States District Judge:


        This wrongful death / survivorship suit arises out of the

untimely and tragic death of Tracy Hottenstein.[1]  Presently

before the Court are three Motions for Summary Judgment pursuant

to Federal Rule of Civil Procedure 56(a) filed by: (1)

Defendants Sea Isle Ambulance Corps (SIAC) and Phyllis Linn; (2)

Defendants City of Sea Isle City, Thomas McQuillen, Vincent

Haugh, and Harold Boyer; and (3) Defendants Zaki Khebzou and

Atlantic Emergency Associates (AEA).  The Court notes that

Defendants Atlanticare Regional Medical Center, Atlanticare MICU

Medics at Base 3, and Atlantic City Medical Center have not

moved for Summary Judgment at this time, but have moved to limit

---

[1] The Court exercises federal question subject matter jurisdiction pursuant to
28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

damages as to their liability, which was decided in an Order and Opinion dated October October 3, 2013. (Dkt. nos. 135, 136.)

## I.

Sometime after 2:15 a.m. on February 15, 2009, in Sea Isle City, Tracy Hottenstein, who was intoxicated at the time, fell off a public dock into the ocean below.[2] As a result of some of the events that occurred after her disappearance, Tracy died.

Tracy was discovered less than six hours after her fall, at approximately 7:52 a.m., when Francis Haney placed a 911 call to report a body found on the Sea Isle City Marina boat launching ramp. (Pls.' Ex. 15; Pls.' Ex. 16 at 1.) At the instruction of the 911 dispatcher, Haney got "pretty close" to Tracy's body and ascertained that she was not breathing because he could not see her chest moving, but he did not check her pulse because he was unsure how to do so. (Pls.' Ex. 20 at 30-31; Pls.' Ex. 16 at 1-3.)

---

[2] On February 14, 2009, Tracy attended the Polar Bear Plunge in Sea Isle City with friends, and afterwards went to LaCosta Lounge and Ocean Drive bars. She was last seen departing the Ocean Drive bar on surveillance video sometime around 2:15 a.m., and was not seen again until a bystander, Francis Haney, discovered her body early the next morning. For further details on Tracy's activities following the Polar Bear Plunge, see *Hottenstein v. Sea Isle City*, 768 F.Supp.2d 688 (D.N.J. 2012).

Over the course of the next thirty minutes, police and
rescue personnel responded to the scene.  Shortly after Haney's
911 call, Sea Isle City police officers arrived - Officer Thomas
McQuillen was first to respond, and Officer Vincent Haugh and
Sergeant Harold Boyer arrived fifteen to twenty seconds later.
(Defs.' Sea Isle City Br. Ex. A at 53-54.)  Upon his arrival at
the scene, McQuillen immediately brought out his first aid
materials to render aid to Tracy.  (Defs.' Sea Isle City Ex. A
at 68.)  McQuillen first attempted to locate a pulse at her
carotid artery but failed to find one. (*Id.* at 72-73.)  Next, he
looked at Tracy's chest and observed that it was not rising and
falling.  (*Id.*)  In McQuillen's recollection, Boyer then
attempted to locate Tracy's pulse, also at her carotid artery,
but failed to find it as well.  (*Id.*; Pls.' Ex. 2.)  At his
deposition, Haugh also reported that he checked for Tracy's
pulse, and like his fellow officers, failed to find her pulse
and recorded that fact in his report.  (Defs.' Sea Isle City Ex.
E at 30:10-16; Pls.' Ex. 4.)  All three officers also recorded
that Tracy's body was a pale, grayish color and was obviously
cold.  (*See* Pls.' Ex. 2-4.)

With these observations in hand, McQuillen and Boyer
consulted with one another and concluded that Tracy was

deceased.[3] (Defs.' Sea Isle City Ex. A at 77) After making this determination, McQuillen, Boyer, and Haugh closed off the area around Tracy's body for preservation, treating it as a crime scene. (*Id.* at 106.)

Shortly after the scene around Tracy was cordoned off, Phyllis Linn, Assistant Chief of the Sea Isle Ambulance Corps, arrived in her personal vehicle, even before an SIAC ambulance arrived. (Pls.' Ex. 1 at 39; Defs.' Sea Isle Ambulance Corps Ex. D at 8.) However, because the area around Tracy was treated as a crime scene, neither Linn nor SIAC personnel were permitted to treat Tracy or approach her body. (Defs.' SIAC Br. at 5.) Linn was prohibited from getting any closer than fifteen to twenty feet from Tracy because of the yellow tape that the officers strung to preserve the scene. (Pls.' Ex. 1 at 41; Defs.' SIAC Ex. D at 8.) For the same reason, other members of the SIAC who arrived with the ambulance also failed to physically examine Tracy because they also could not cross the yellow tape; the SIAC report indicates that SIAC personnel were twenty feet away, and "EMS did not come in contact with the PT

---

[3] Though they failed to include it in their reports, Boyer and McQuillen each noted that they observed additional discoloration on Tracy's body when recalling the scene at their depositions. (*See* Pls.' Ex. 2-4.). Specifically, they observed areas of redness on Tracy's back and side, which they believed to be lividity, a condition where blood pools at the lowest lying portion of the body, and a sign that both understood as a condition indicating death. (Defs.' SIAC Ex. B at 128-29; Defs.' SIAC Ex. C at 150-53.).

[patient]." (Pls.' Ex. 12 at 1.) In spite of the distance, the SIAC report recorded that Tracy's body showed lividity. (*Id.*). From her vantage point at the perimeter, Linn also observed lividity, which she confirmed in a conversation with Boyer, leading her to the conclusion that Tracy was deceased. (Pls.' Ex. 1 at 41, 45.)

Shortly after the arrival of the SIAC ambulance and personnel, paramedics also arrived at the scene. (Defs.' SIAC Ex. D at 9.) Like all the others at the scene, paramedics Michael Senisch and Frank Rocco were not permitted to come into physical contact with Tracy. (Defs.' Khebzou Ex. F at 78-81.) Senisch was, however, permitted to approach Tracy's body more closely, coming within six feet of her, according to his recollection. (Pls.' Ex. 17 at 46:10-11.) As described at his deposition, Senisch was called to the scene for a "pronouncement," which was reiterated to Senisch when he arrived at the scene, where Boyer informed him that Tracy was "pulseless and apneic," and "that [the paramedics] were called there for a pronouncement." (*Id.* at 44-45.) At 8:21 a.m., nine minutes after the paramedics' arrival at the scene, Senisch called Dr. Zaki Khebzou for the official death pronouncement. (Defs.' Khebzou Ex. E-F) Following Senisch's description of Tracy's condition, Dr. Khebzou pronounced Tracy deceased by telephone at

8:22 a.m.  (Pls.' Ex. 5.)  It is unclear precisely when Tracy's body was finally removed from the scene on February 15.

In spite of this declaration of death, Tracy may not have been deceased at 8:22 a.m.  Two experts, upon review of the facts and circumstances of the case, concluded that severe hypothermia may manifest symptoms that look akin to death. (Pls.' Ex. 7 at 11; Pls.' Ex. 6 at 10.)  Moreover, the Plaintiffs point to inconsistencies between observations recorded in police reports (which omit statements regarding lividity, for example), as compared with the recollection of police officers, to suggest that Tracy's condition was not properly diagnosed.  Regardless, there is no dispute that even prior to Dr. Khebzou's pronouncement, Tracy's body was cordoned off while the police investigated the scene and surroundings.

Defendants presently move for summary judgment on the claims remaining against them, including those asserted under state law theories of negligence and both federal and New Jersey state law civil rights claims.


## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party.  *See Boyle v. Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).  The moving party bears the burden of establishing that no genuine issue of material fact remains.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.

The Court first addresses the Motions for Summary Judgment regarding the civil rights claims under both § 1983 and the New Jersey Civil Rights Act.  Next, the Court addresses the Motions for Summary Judgment regarding claims of negligence asserted against the City of Sea Isle City and individual police officers (the "municipal Defendants").  Third, the Court addresses the claims for negligence asserted against Dr. Zaki Khebzou and Atlantic Emergency Associates, and then separately addresses

claims for negligent hiring, supervision, and retention alleged against Sea Isle City and AEA. Fourth, the Court addresses the Motions for Summary Judgment on punitive damages. Finally, the Court addresses claims of premises liability asserted against Sea Isle City.[4]

## A.

The Plaintiffs' Amended Complaint alleges three separate claims of civil rights violations under 42 U.S.C. § 1983. Count Ten alleges the municipal Defendants violated § 1983, Count Eleven brings a wrongful death and survival action pursuant to the statute against both the municipal Defendants and Linn and the Sea Isle Ambulance Corps, and Count Twelve alleges the municipal Defendants are liable under a theory of state-created danger. The Court considers these three claims and the corresponding Motions for Summary Judgment together.

Consideration of the Defendants' Motions for Summary Judgment on the Plaintiffs' § 1983 claims ordinarily presents two separate legal issues for liability – first, whether the

---

[4] The Court will not permit the reinstatement of New Jersey Civil Rights Act claims as to Defendant Khebzou. While Rule 15(a) permits the amendment of pleadings before trial, the Plaintiffs have requested reinstatement of their NJCRA claim without the consent of the opposing party. Fed. R. Civ. P. 15(a)(2). The Plaintiffs have not provided any rationale for why "justice so requires" the reinstatement of the claim. *Id.* Because the Plaintiffs cannot provide a rationale for the reinstatement of this claim at the close of discovery, even if this request for reinstatement were made in a Motion to Amend, it would be denied.

Defendants acted under color of law, and second, whether the Defendants violated a constitutional right. Because the evidence produced in discovery does not demonstrate that a constitutional violation occurred, the Court need not consider the color of state law analysis and grants summary judgment for all Defendants on each count alleged under § 1983.

The Due Process Clause of the Fourteenth Amendment does not impose an affirmative right to governmental aid, "even where such aid may be necessary to secure life, liberty, or property interest of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dept. of Social Svs.*, 489 U.S. 189, 196 (1989). In particular, "there is no federal constitutional right to rescue services, competent or otherwise." *Brown v. Commonwealth of Pa. Dep't of Health*, 318 F.3d 473, 478 (3d Cir. 2003). In light of *DeShaney*, there are two exceptions to the general "non-liability rule." *Id.* "First, the state has a duty to protect or care for individuals when a 'special relationship' exists. Second, the state has a duty when a 'state-created danger' is involved." *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006) (internal footnote omitted).

Special relationships generally arise in custodial relationships; thus, the state and its "incarcerated or involuntarily committed citizens is the kind of 'special

relationship'" that might require the state to provide adequate medical care and ensure the "reasonable safety" of involuntarily committed mental patients. *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982)). In other words, the state must affirmatively deprive the individual of the freedom to act "on his own behalf." *Morrow*, 719 F.3d 168 (citing *DeShaney*, 489 U.S. at 200).

Here, the Plaintiffs have failed to provide evidence that any of the Defendants entered into a comparable custodial relationship with Tracy. In particular, Linn testified at her deposition that by the time she arrived, the police had already cordoned off Tracy's body and did not permit her to pass. (Pls.' Ex. 1 at 41.) The SIAC ambulance run report, summarizing the actions of the SIAC personnel, reflects the same. (Pls.' Ex. 12.) Though the Plaintiffs argue that Linn and SIAC personnel treated "Tracy's situation . . . like that of a pretrial detainee, a prisoner or an involuntary commitment," there is no actual indication that Linn or SIAC were the ones who were responsible for the cordon. (Pls.' Br. at 22.) In other words, there is no evidence to suggest that Linn and SIAC were Tracy's custodians when they arrived at the scene.

Similarly, claims alleging that the police officers or Sea Isle City resulted in a special relationship are not borne out

in the facts produced in discovery. Though the Plaintiffs argue
that the cordon surrounding Tracy was akin to creating a
custodial relationship, the cause of Tracy's incapacity was
separate from the actions of the police at the scene. (*See*
Pls.' Ex. 6-7.) The Plaintiffs' experts describe a tragic
combination of alcohol and cold weather that resulted in Tracy's
death from hypothermia. (Pls.' Ex. 6 at 12; Pls.' Ex. 7 at 13-
14.) As the Plaintiffs' experts explain, the alcohol and cold
weather were the causes of Tracy's incapacity, not the stringing
of yellow tape. Thus, there was no special relationship between
Tracy and the municipal Defendants that would impose a duty to
render aid.

Returning to the state-created danger theory of liability
under § 1983, a constitutional violation "can occur when state
authority is affirmatively employed in a manner that injures a
citizen or renders him 'more vulnerable to injury'" than he
would have otherwise been. *Bright v. Westmoreland Cnty.*, 443
F.3d 276, 281 (3d Cir. 2006) (quoting *Schieber v. City of
Phila.*, 320 F.3d 409, 416 (3d Cir.)). A state-created danger
exists when the plaintiff can demonstrate each of the following
four elements:

> (1) the harm caused was foreseeable and fairly
> direct, (2) a state actor acted with a degree
> of culpability that shocks the conscience, (3)
> a relationship between the state and the

> plaintiff existed such that the plaintiff was
> a foreseeable victim of the defendant's acts
> . . . and (4) a state actor affirmatively used
> his or her authority in a way that create a
> danger to the citizen or that rendered the
> citizen more vulnerable to danger than had the
> state not acted at all.

*Morrow v. Balaski*, 719 F.3d 160, 177 (3d Cir. 2013).

The requisite culpability for a state-created danger claim, the "shocks the conscience" standard, depends upon the circumstances of the state official's actions. *Schieber v. City of Phila.*, 320 F.3d 409, 417 (3d Cir. 2003). "[C]ustomary tort liability" is insufficient for demonstrating the necessary culpability, as the "Constitution does not guarantee due care on the part of state officials," while circumstances where state actors affirmatively intend to cause harm are on the opposite end of the spectrum, satisfying the "shocks the conscience" standard. *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998)). To determine the level of culpability necessary to shock the conscience, the Court must consider whether the state officials had the opportunity to deliberate and make unhurried judgments. *Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir. 2006). Where such time exists, conscious disregard of a great risk of harm is all the culpability necessary. *Id.* at 310. On the other hand, where state officials must make decisions in a "hyperpressurized environment," an intent to

cause harm is necessary to satisfy the culpability standard. *Id.* at 309.

Under the facts produced during discovery, none of the municipal Defendants' actions approach the "shocks the conscience" standard. Upon arriving first at the scene, McQuillen brought out his oxygen and medical bag from his trunk, (Defs.' Sea Isle City Ex. A at 63:23-24), and then each of the police officers attempted to take Tracy's pulse at the carotid artery. (Pls.' Ex. 2-4.) Each observed her to be "grayish" in appearance and all three concluded that she was dead based on their observations. (*Id.*) Their actions upon arrival at the scene demonstrate that they attempted to render aid, and when such attempts appeared futile, treated the area as a crime scene. These actions manifest neither a conscious disregard of risk nor an intent to cause Tracy harm.[5]

---

[5] Moreover, even if the Plaintiffs could demonstrate that the municipal Defendants' actions shocked the conscience, these Defendants would still be entitled to the defense of Qualified Immunity, established under *Saucier v. Katz*, 533 U.S. 194 (2001). Expanding upon the two-part test for Qualified Immunity, the *Saucier* Court explained that "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* at 205. As the Court continued, "[i]f the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." *Id.* The Plaintiffs have provided no evidence that the municipal Defendants undertook any unreasonable acts: the officers (including one who was a certified EMT) arrived on the scene, immediately checked for a pulse and observed Tracy's grayish coloring and lack of movement, and determined that she was not alive. (Defs.' Sea Isle City Ex. A at 69:23-24; Pls.' Ex. 2-4.) Even assuming that Tracy were alive, as the Plaintiffs' experts conclude was "possible," the police acted reasonably under the circumstances by immediately responding and checking Tracy's pulse and breathing, thereby granting them the protection of Qualified Immunity.

Similarly, Linn and SIAC's actions fail to reach the "shocks the conscience" culpability standard to satisfy a state-created danger claim. As Linn's deposition testimony explained, she responded in approximately ten minutes to the initial 911 call. (Pls.' Ex. 1 at 38:25.) Upon arriving at the scene, Linn walked up to the cordon, attempted to cross it and reach Tracy, but was stopped by a police officer before Sergeant Boyer approached her to relay the news that the area had been deemed a crime scene. (*Id.* at 41:2-19.) Linn and Boyer discussed their observations of lividity on Tracy's body, and Linn knew that Boyer was a certified EMT who had been on scene for some time already. (*Id.* at 41:14-44:19.) None of these actions manifest a level of culpability suggesting that Linn consciously disregarded a great risk of harm to Tracy, nor do they suggest that Linn intended to harm Tracy. Similarly, the SIAC Report indicates that SIAC personnel received a report from the police that Tracy was dead upon their arrival. (Pls.' Ex. 12.) The police reported to SIAC personnel that Tracy displayed lividity, had "foam coming from mouth, [and] eyes extremely dilated." (*Id.*) Their failure to render aid was a result of the police judgment that the area should be a crime scene, not because SIAC personnel sought to consciously put Tracy at risk, nor because of an intent to harm her. In other words, the Plaintiffs have failed to produce any evidence suggesting that Linn or SIAC

personnel manifest the culpability necessary to constitute a
state-created danger.

In short, at the close of discovery, the Plaintiffs have
failed to produce evidence that any of the Defendants held the
culpable mindset necessary to commit a constitutional violation.
In light of this, the Court will grant summary judgment in favor
of all Defendants in the civil rights claims in Counts Ten,
Eleven, and Twelve.

**B.**

Count Thirteen asserts a claim against the municipal
Defendants, Linn, and SIAC for a violation of the New Jersey
Civil Rights Act.  Because the NJCRA is interpreted analogously
with § 1983 and the foregoing analysis explains that no
predicate § 1983 claim exists, summary judgment will be granted
in favor of all the Defendants.

In relevant part, the New Jersey Civil Rights Act provides:

> Any person who has been deprived of any
> substantive due process or equal protection
> rights, privileges or immunities secured by
> the Constitution or laws of the United States,
> or any substantive rights, privileges or
> immunities secured by the Constitution or laws
> of this State, or whose exercise or enjoyment
> of those substantive rights, privileges or
> immunities has been interfered with or
> attempted to be interfered with, by threats,
> intimidation or coercion by a person acting

> under color of law, may bring a civil action
> for damages and for other injunctive or other
> appropriate relief.

N.J.S.A. 10:6-2(c).  "This district has repeatedly interpreted NJCRA analogously to § 1983." *Pettit v. New Jersey*, 2011 WL 1325614, at *3 (D.N.J. 2011).  The Plaintiffs properly point out that the NJCRA has a "broad remedial purpose." *Owens v. Feigin*, 947 A.2d 653, 656 (N.J. 2008).  However, the NJCRA and § 1983, when pled together, are analyzed under the same standard; first, the Defendant must have acted under color of state law, and second, the Defendant must have violated a constitutional right. *Pettit*, 2011 WL 1325614 at *4; *see also Hottenstein v. Sea Isle City*, 793 F.Supp. 2d 688, 695 (D.N.J. 2011).

Putting aside the color of state law analysis, the record and foregoing analysis do not demonstrate that any of the municipal Defendants nor Linn and the SIAC deprived Tracy of her constitutional rights.  Thus, just as the Defendants have demonstrated they are entitled to summary judgment on Counts Ten, Eleven, and Twelve, they are similarly entitled to summary judgment on the accompanying NJCRA claim in Count Thirteen.

## C.

Counts One, Six, and Seven allege claims of negligence against each of the municipal Defendants.  Specifically, Count

One alleges negligence against each Defendant, Count Six alleges
a survival action based upon negligence, and Count Seven alleges
a wrongful death action based upon negligence.  The municipal
Defendants argue that they are entitled to summary judgment on
each of these counts because their actions are protected by the
Good Faith Immunity provision of the New Jersey Tort Claims Act.
Because the record demonstrates that the Defendants acted in an
objectively reasonable fashion and with subjective good faith,
they are entitled to the protection of good faith immunity and
summary judgment is granted in favor of the municipal Defendants
on these three claims alleging negligence.

The New Jersey Tort Claims Act provides public employees
immunity from suit.  N.J.S.A. 59:3-3.  Specifically, "[a] public
employee is not liable if he acts in good faith in the execution
or enforcement of any law.  Nothing in this section exonerates a
public employee from liability for false arrest or false
imprisonment."  *Id.*  A public employee can satisfy the good
faith requirement either by demonstrating "objective
reasonableness," or that the public employee behaved with
"subjective good faith."  *Alston v. City of Camden*, 773 A.2d
693, 703 (N.J. 2001) (quoting *Fielder v. Stonack*, 661 A.2d 231,
246 (N.J. 1995)).

However, even in spite of good faith immunity, public
employees may lose the protection of immunity when they fail to

provide emergency medical treatment to individuals in their custody. *See Del Tufo v. Twp. of Old Bridge*, 650 A.2d 1044 (N.J. Super. App. Div. 1995). In *Del Tufo*, a decedent's estate brought a wrongful death action against the police officers who arrested the decedent, on the theory that officers' failure to provide emergency aid to the decedent was the proximate cause of death. *Id.* at 1046-47. In particular, the police observed the decedent's erratic behavior and injuries, yet waited nearly an hour to summon medical care for treatment. *Id.* at 1046-47. The New Jersey Supreme Court rejected the police officers' contention that they were entitled to good faith immunity, holding that "[t]heir duty to execute or enforce the law did not preclude them from providing emergency medical assistance to their arrestee. The immunity for enforcing and executing the law does not protect defendants." *Id.* at 1051; *see also Rosario v. City of Union City Police Dept.*, 131 Fed. Appx. 785, 790 (3d Cir. 2005) (explaining application of good faith immunity).

The municipal Defendants have credibly demonstrated that they acted with subjective good faith and objectively reasonable under the circumstances. For example, McQuillen was first to arrive on the scene and responded with oxygen and a medical bag that he carried in his trunk. (Defs. Ex. A at 69-70.) All three attempted to take Tracy's pulse, and after failing to find one and observing her body to be "cold" and "grayish," the

officers determined that Tracy was deceased and began preserving the area as a crime scene.  (Pls.' Ex. 2-4.)

Moreover, in viewing the facts in the light most favorable to the Plaintiffs, there is no ground to reject the Defendants' claim for good faith immunity.  There is no allegation in the record that the officers affirmatively ignored Tracy's condition.  Rather, the record reflects that the officers immediately responded to the 911 call and attempted to render the necessary care to an unconscious victim, and after determining that Tracy lacked a pulse, they provided that information to Linn and the SIAC, as well as the paramedics when they arrived on scene.  (*See* Pls.' Ex. 1 at 41; Ex. 2-4; Ex. 17 at 43.)  In light of these circumstances, the officers did not fail to render medical care nor did they withhold medical care from an individual in their custody that obviously required such care.  Thus, the officers are entitled to the protections of good faith immunity provided by N.J.S.A. 59:3-3 and therefore the Court will grant summary judgment in favor of McQuillen, Boyer, Haugh, and the City of Sea Isle City on Counts One, Six, and Seven.

## D.

Defendant Zaki Khebzou seeks summary judgment in his favor on Counts One, Six, Seven, and Nine, each of which alleges that

Kebzou was negligent. The facts produced in discovery do not provide grounds for granting Khebzou summary judgment on any of these claims.

Under New Jersey law, a plaintiff in a medical malpractice action must prove three elements: (1) there is an applicable standard of care, (2) a deviation from that standard occurred, and (3) the deviation was the proximate cause of the harm sustained by the plaintiff. *Verdicchio v. Ricca*, 843 A.2d 1042, 1055-56 (N.J. 2004). Where a "defendant's negligence combines with a preexistent condition to cause harm," New Jersey has adopted the substantial factor standard. *Id.; Flood v. Aluri-Vallabhaneni*, 70 A.3d 665, 571 (N.J. Super. Ct. App. Div. 2013). The substantial factor test requires the Court to inquire "whether the defendants' deviation from the standard medical practice increased a patient's risk of harm or diminished a patient's chance at survival and whether such increased risk was a substantial factor in producing the ultimate harm." *Verdicchio*, 843 A.2d at 1056 (quoting *Gardner v. Pawliw*, 696 A.2d 599, 608 (N.J. 1997)).

When appropriately applied, the substantial factor test requires the plaintiff to first demonstrate that the defendant's negligence "actually increased the risk of an injury that later occurs." *Verdicchio*, 843 A.2d at 1056. Following that, the jury must then determine whether "the increased risk was a

substantial factor in bringing about the harm that occurred."
*Id.* In *Verdicchio*, the decedent and his survivors filed a
lawsuit alleging medical malpractice in failing to provide a
timely diagnosis of the decedent's cancer. *Id.* at 1046. To
satisfy the substantial factor test, the plaintiffs "were
required only to show that [the doctor's] failure to perform an
examination that would have led to the discovery of the cancer
increased the risk that [the decedent] would lose the
opportunity for treatment at an earlier stage." *Id.* at 1062.
In other words, plaintiffs asserting a medical malpractice claim
in a substantial factor case need to demonstrate that the
defendant's actions increased the plaintiff's risk of harm;
whether the defendant actually was a substantial factor in that
harm is left to the jury.

Despite Khebzou's arguments, the Plaintiffs have produced
sufficient evidence in discovery to suggest that Khebzou's
behavior may constitute negligence increasing Tracy's risk of
harm. To pronounce a patient deceased outside of a hospital,
"[a] physician may specify another physician or may arrange with
a professional nurse (R.N.) or a paramedic in accordance with
N.J.A.C. 8:41-3.9, which requires the relay of findings,
*including telemetered electrocardiograms, if feasible* to attend
to the presumed decedent and make the determination and
pronouncement." N.J.A.C. 13:35-6.2(d) (emphasis added). At his

22

deposition, Khebzou acknowledged that he knew of the N.J.A.C.
provision requiring that he receive such test results, if they
could feasibly be provided. (Pls.' Ex. 25 at 140-41.)
Nonetheless, Khebzou declared Tracy deceased at 8:22 a.m., after
Boyer, Haugh, and McQuillen checked unsuccessfully for a pulse,
but without any physical contact or examination by SIAC
personnel or paramedics. (Pls.' Ex. 2-4.) Khebzou's
pronouncement was based upon a phone call from the paramedics,
who indicated that "[p]olice wishes us to preserve the scene. .
. . We have not hooked the patient up but I do see irreversible
signs of death." (Pls.' Ex. 5). Given that Tracy may have been
alive at 8:22 a.m., (Pls.' Ex. 6 at 11; Pls.' Ex. 7 at 11)
Khebzou's pronouncement of death may have been premature and cut
off Tracy's opportunity to receive medical care.[6] The Plaintiffs
therefore have produced sufficient evidence to suggest that
Khebzou's actions were a substantial cause of Tracy's harm,

---

[6] For similar reasons, Khebzou's argument that any liability should be reduced
based on his portion of the fault is not appropriate for summary judgment.
Assuming that the fact finder at trial determines that Khebzou's negligence
was a substantial factor in the Plaintiffs' harm, "a defendant nonetheless
has the 'burden of segregating recoverable damages from those solely incident
to the preexisting disease.'" *Anderson v. Picciotti*, 676 A.2d 127, 212 (N.J.
1996) (quoting *Fosgate v. Corona*, 330 A.2d 355, 358 (N.J. 1974)). Khebzou
argues that the Plaintiffs' expert put Tracy's chance of survival at 10-33%
and thus Khebzou's liability should be limited to this range. (Pls.' Ex. 12
at 5; Defs. Br. at 22.). However, such a judgment would be inappropriate at
this time, as the defendant clearly bears the burden of segregating such
damages and Khebzou has failed to produce any facts of his own apportioning
liability.

thereby satisfying the substantial factor test. Summary judgment in Khebzou's favor would therefore be inappropriate.

## E.

Khebzou's employer, Defendant Atlantic Emergency Associates, also moves for summary judgment on Counts One, Three, Six, and Seven. Counts One, Six, and Seven allege negligence, a survival action premised upon negligence, and wrongful death premised upon negligence. Count Three alleges vicarious liability for AEA's employee, Khebzou. Because the material facts regarding Khebzou's negligence are still in dispute and principles of *respondeat superior* may apply to such claims, summary judgment for vicarious liability is inappropriate at this time. However, summary judgment will be granted in AEA's favor as to all direct claims of negligence.

*Respondeat superior* permits the imposition of liability on an employer for the negligence of an employee that causes harm to a third party, "if, at the time of the occurrence, the employee was acting within the scope of his or her employment." *Carter v. Reynolds*, 815 A.2d 460, 463 (N.J. 2003) (citing *Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 462 (N.J. 1993)). To properly establish such liability, a plaintiff must establish two elements: (1) a master-servant relationship existed, and (2)

"the tortious act of the servant occurred within the scope of that employment." *Carter*, 815 A.2d at 463.

At this time, there are no facts in dispute regarding the vicarious liability of AEA. AEA acknowledges that it was Khebzou's employer "at the time of the incident at issue in this case and therefore may be vicariously liable for the defendant's [Khebzou's] actions." (Def. Br. at 26 n.3.) In the event Khebzou is held liable for his own negligent acts at trial, the Plaintiffs may pursue claims of vicarious liability against AEA as Khebzou's employer at the time of Khebzou's negligent acts. Therefore, this Court cannot grant summary judgment in favor of the Defendants for claims of vicarious liability for the acts of Khebzou that may ultimately be deemed negligence.

However, even viewing the evidentiary record in the light most favorable to the Plaintiffs, the record fails to demonstrate a link between AEA's allegedly negligent behavior and the harm sustained by the Plaintiffs. The Plaintiffs point to the conclusions of their expert, Dr. Paul Auerbach, asserting that AEA "negligently breached [its] duty to implement policies to assure the proper treatment of this hypothermic patient." (Pls.' Ex. 7 at 13.) Dr. Auerbach's conclusion, however, only acknowledges that it is "possible that [AEA] unnecessarily allowed the progression of a grievous medical situation," and contributed to Tracy's death. (*Id.*) This conclusion falls

short of explaining how AEA's missing policies were a substantial cause of the hypothermia, contracted between 2:15 a.m. and 7:52 a.m., which was ultimately determined to be the cause of Tracy's death. (Pls.' Ex. 6 at 12, ¶ 1.) Because the evidentiary record fails to demonstrate that AEA's missing policies were a substantial cause of Tracy's death from hypothermia, the Court will grant summary judgment in favor of Defendants for all direct claims of negligence alleged in Counts One, Six, and Seven.

### F.

Defendants Sea Isle City and AEA each move for summary judgment in their favor on Count Two, which alleges a claim of negligent hiring, supervision, and retention. Because the Plaintiffs have failed to demonstrate that the Defendants had any knowledge about the unfitness or incompetence of their employees, summary judgment will be granted in their favor on Count Two.

Under New Jersey law, the tort of negligent hiring, supervision, and retention requires the satisfaction of two elements. First, the plaintiff must demonstrate that the employer "knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a

risk of harm to other persons." *Di Cosala v. Kay*, 450 A.2d 508, 516 (N.J. 1982); *Lingar v. Live-In Companions, Inc.*, 692 A.2d 61, 65-65 (N.J. Super. App. Div. 1997). Second, the plaintiff must show that as a result of the employer's negligent hiring, the employee's "incompetence, unfitness or dangerous characteristics," were the proximate cause of the plaintiff's injuries. *Di Cosala*, 450 A.2d at 516.

At the close of discovery, the Plaintiffs have failed to produce any evidence demonstrating AEA's knowledge of Khebzou's unfitness, incompetence, or dangerous attributes as an employee. At most, the Plaintiffs have shown that their experts believe AEA failed to impose appropriate policies for treating hypothermic patients, thereby breaching AEA's duty of care to Tracy. (Pls.' Ex. 7 at 13.) However, even assuming that AEA did breach such a duty of care, any such breach would still fail to make out a prima facie case of negligent hiring, supervision, and retention. Therefore, the Court will grant summary judgment in favor of AEA on Count Two.

Similarly, the Plaintiffs have failed to produce any evidence demonstrating the City of Sea Isle City's knowledge of its employees' unfitness, incompetence, or dangerous attributes as employees. While the evidentiary record reflects the Plaintiffs' expert's opinion that the Sea Isle City Police Department failed put in place certain policies regarding the

treatment of hypothermia victims, nothing in the record reflects any knowledge of McQuillen, Haugh, or Boyer's unfitness, incompetence, or dangerous attributes as employees of the police department. Thus, the Plaintiffs have failed to demonstrate the prima facie case for the tort of negligent hiring, and Defendant Sea Isle City must be granted summary judgment in its favor on Count Two.

### G.

Defendants Khebzou, AEA, Sea Isle City, Boyer, McQuillen, and Haugh seek summary judgment in their favor on claims seeking punitive damages. The Defendants argue that the Plaintiffs have produced no facts supporting a punitive damages award. The Court is skeptical of the Plaintiffs' ultimate success on claims for punitive damages, but viewing the facts in the light most favorable to Plaintiffs, declines to grant summary judgment at this time.

Under New Jersey's Punitive Damages Act,

> [p]unitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

N.J.S.A. 2A:15-5.12(a).  Negligence, "no matter how gross,"

cannot form the basis of an award for punitive damages, and

therefore a plaintiff must demonstrate that the defendant's act

was "wanton and willful" by showing "a deliberate act or

omission with knowledge of a high degree of probability of harm

and reckless indifference to the consequences." *Smith v.*

*Whitaker*, 734 A.2d 243, 254 (N.J. 1999); *see also Cruz v. Atco*

*Raceway*, 2013 WL 3283964, at *6-7 (D.N.J. June 27, 2013)

(holding that defendant's deliberate indifference to New Jersey

safety regulations and knowledge of the severe consequences for

failure to follow such regulations would permit a reasonable

jury to find wanton and willful conduct).

   The record evidence, viewed in the light most favorable to

the Plaintiffs, supports a reasonable conclusion that Khebzou

deliberately ignored New Jersey regulations for the

pronouncement of death outside of a hospital.[7]  (Pls.' Ex. 25 at

140-41.)  Khebzou learned from the paramedic that Tracy

displayed signs of death, but had not been "hooked up."  (Pls.'

Ex. 5)  Without asking any further questions, Khebzou elected to

declare Tracy deceased anyway, even though he knew New Jersey

regulations for declaring a patient deceased required such test

results, if feasible, and therefore did not follow those

---

[7] N.J.A.C. 13:35-6.2 requires a paramedic or other medical professional to
relay the findings of "telemetered electrocardiograms, if feasible" to the
physician making the declaration of death.

regulations. (Pls.' Ex. 25 at 140-41.) Though the record is not clear whether Boyer, McQuillen, and Haugh deliberately ignored the regulation, the Plaintiffs have demonstrated that the Defendants cordoned off Tracy's body and determined her to be deceased without a pronouncement of death. (Pls.' Ex. 23 at 49-50; *see also* Pls.' Ex. 26 at 146-47; Pls.' Ex. 29 at 30-31.) Rather, McQuillen and Boyer consulted with each other after failing to find a pulse on Tracy and concluded that she was deceased. (Defs. Sea Isle City Ex. A at 77)

In short, the record evidence, viewed in the light most favorable to the nonmoving parties for summary judgment, permits a reasonable conclusion that the Defendants' actions may have constituted a wanton and willful act within the bounds of the Punitive Damages Act. Whether the evidence adduced at trial only demonstrates negligence, which would prohibit punitive damages under the terms of the statute, is unclear at this point but may be addressed again upon appropriate motion at trial.

**H.**

Defendant Sea Isle City moves for summary judgment on Count Four, which alleges premises liability based upon a dangerous and defective condition in the public marina where Tracy was discovered. Because the evidentiary record does not demonstrate that Tracy's harm was the proximate cause of a dangerous

30

condition in the Marina, summary judgment will be granted in favor of the Defendant.[8]

The New Jersey Tort Claims Act governs the liability of public entities for alleged dangerous conditions of public lands. To impose liability, a plaintiff must show that the property was in a dangerous condition at the time of the injury, the injury was proximately caused by the dangerous condition, and the dangerous condition created a "reasonably foreseeable risk of the kind of injury which was incurred." N.J.S.A. 59:4-2. In addition, a plaintiff must show that either an employee of the public entity acting within the scope of his employment created the dangerous condition, or that the public entity had actual or constructive notice of the dangerous condition with enough time to have corrected it before the incident in question. *Id.* Finally, the Act grants the public entity immunity from liability "if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable." *Id.*

---

[8] Initially, Sea Isle City argues that the Plaintiffs' expert report must be excluded as a net opinion under New Jersey law. A net opinion is an expert opinion that is not based "on a proper factual foundation." *Buckalew v. Grossbard*, 435 A.2d 1150, 1157 (N.J. 1981). However, the admissibility of expert testimony in federal court is governed by the standards of Federal Rule of Evidence 702. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Whether New Jersey standards of admissibility should be followed in light of Rule 702 is moot, as the evidentiary record fails to demonstrate the alleged dangerous condition was a proximate cause of Tracy's harm.

The Court focuses on issues of causation in determining that the record evidence, even when viewed in the light most favorable to the Plaintiffs, fails to satisfy the requirements of the Act. The Plaintiffs' expert report fails to address how the allegedly dangerous conditions of the Sea Isle City Marina caused Tracy's harm. (*See* Pls.' Ex. 31.) While the report details both likely and unlikely scenarios, none of the scenarios actually explain how Tracy fell at the Marina. (*Id.* at 10-11.) In the "likely scenario," the Plaintiffs' expert asserts that Tracy "fell from the bulkhead onto the edge of a floating dock below[,] near slip 73, and then fell from the floating dock into the water." (*Id.*) Under the more unlikely scenarios, the Plaintiffs' expert asserts that Tracy may have lost her balance or slipped between floating docks. (*Id.*) In either case, the expert testimony fails to determine the cause of Tracy's fall or how she lost her balance and fell. In the absence of any evidence in the record demonstrating her fall, the Plaintiffs have failed to demonstrate that the dangerous condition of the Marina could have been a proximate cause of Tracy's harm. Because the Plaintiffs have failed to show that the dangerous condition in the Marina was a proximate cause of Tracy's harm, Sea Isle City is entitled to summary judgment on the premises liability claim in Count Four.

**IV.**

In conclusion, the circumstances of Tracy Hottenstein's death are undoubtedly tragic but remain unclear at the close of discovery.  In light of the facts developed in the evidentiary record, and for the specific reasons stated above, (1) Defendants Sea Isle Ambulance Corps and Phyllis Linn's Motion for Summary Judgment will be fully granted on the civil rights claims alleged against them; (2)  Defendants City of Sea Isle City, Thomas McQuillen, Vincent Haugh, and Harold Boyer Motion for Summary Judgment will be fully granted, covering (a) the civil rights claims under both § 1983 and the New Jersey Civil Rights Act, (b) premises liability claims, and (c) negligent hiring, supervision, and retention, and (d) negligence alleged in Counts One, Six, and Seven; and (3) Defendants Zaki Khebzou and Atlantic Emergency Associates Motion for Summary Judgment will be granted as to claims of negligent hiring and direct negligence against AEA, and denied as to the direct negligence of Khebzou and the vicarious liability of AEA.  An appropriate Order accompanies this Opinion.


Date: 10/11/13


                              /s/ Joseph E. Irenas
                        **JOSEPH E. IRENAS, S.U.S.D.J.**